All right, so now we'll call our first case 23-2420. Counsel, is your client's name pronounced Knudsen or Knudsen? We've had many questions about the pronunciation of this name this morning. I've been saying Knudsen. Knudsen. We'll call it, we'll go with Knudsen. Good afternoon. Good afternoon, Your Honor, and may it please the court. Charlie Gokey for the appellant, Marla Knudsen, if you will, and William Dutra. And I have reserved three minutes for rebuttal if it pleases the court. Sure, we can't quite hear you though. Oh, apologies, Your Honor. I will endeavor to lean closer to the microphone here. You said you want three minutes for rebuttal? Yes, please. All right, good. Thank you. Supreme Court said in full the very case that Metlife relies upon most heavily in this appeal that court should not make standing in ERISA cases more complicated than it needs to be by ignoring first principles of standing law. They said that on the way to finding that there was no standing. Certainly. In a case that seems really analogous to yours, maybe you can help me understand the difference. And is the difference that you're relying upon the fact that you're dealing with a health plan as opposed to a pension plan? Is that a material difference or is that even a difference that you're relying upon? No, Your Honor, that's in and of itself not the important difference here. Now, in full, what the Supreme Court held was that ordinary standing analysis applies in ERISA cases. Now, in that case, ordinary standing analysis dictated that the plaintiffs had no standing because they admittedly had suffered no individual injury. They had suffered no financial loss and therefore they had not lost assent. And even if they won the case, they would not gain assent. The difference here is that the plaintiffs are not similarly situated. The plaintiffs here... As I read your complaint, there's no specific loss. The language used was, it may, it might. Well, Your Honor, if you note in paragraph 34, we also say that the removal of these plan assets necessarily resulted in the payment of higher premiums. So it's not quite as... Yeah, it is. And it depends on the formula. Well, it's not speculation because it's based on... Well, it's an allegation of fact. So there are actuarial processes in place here. Discovery will show that either these actuarial processes resulted in this loss or they didn't. So that is a provable fact. It exists in the world. And at this point, we, of course, can't allege the details of this actuarial process because that is information known solely to MetLife. So my concern, though, is that, you know, you've told us that, you know, on average over a few years, your clients have ended up paying about 30% of the plan's costs, right? But I don't see anything in the language of the plan, any contractual language that says that they will be paying 30%. In fact, it seems that the employer has the discretion to determine the payment amount. And so, you know, sometimes the employer gets more money, sometimes the employer gets less money. But, you know, your clients are kind of subject to the vagaries of that plan. So, Your Honor, the plaintiffs here allege that during the relevant period, MetLife had essentially a fixed formula, something that was plug and play, that would take account of excess plan assets available for benefits to defray the overall contributions required to fund the plan, which was split 70-30 between MetLife and the plaintiffs here. That could change every year, correct? Excuse me? That could change every year, correct? Well, Your Honor, the plaintiffs allege that during this time it did not. And so I think that... That's not the question. Oh, it could... The question is not did it change, but it could change every year. Could it change? Could MetLife have done something different than it did? Yeah, MetLife could have done something different than it did. But I think one... Hold on one second, though. Paragraph 21 says, during the last five years, plan participants have paid, on average, around 30% of overall contributions to the plan. So where is that any sort of an obligation to charge 30%? Your Honor, it's not necessarily an obligation to charge 30%. But I think that part of what's happening here is we're confusing the violation of ERISA with the injury that resulted from the violation of ERISA. So if we're talking about obligations of the plan that it imposed on MetLife, well, both parties have cited a plan document that says the drug rebates at issue here were obligated to fund the plan, to pay plan expenses. Now, the plaintiffs here allege that MetLife didn't do that, that it took this money for its own use and enjoyment with no benefit whatsoever to the plan. Why isn't that like Prohman? Excuse me? In fact, why isn't that like Prohman? Prohman's even worse because there was some self-dealing there on the part of the plan administrator. Well, Your Honor, Prohman tracks almost exactly the analysis of Thole, which, again, I think supports rather than hurts our case. In Prohman, the issue, again, was the mere diminution of a pension plan's assets with no concrete financial injury to the plaintiff. The plaintiff admittedly had not lost assent. And again, as in Thole, if the plaintiff won that case, they would not gain assent. Now, again, this case is a case where our plaintiffs allege that they were required to pay inflated premiums as a natural result flowing from this violation of ERISA. That is a historical allegation. So you're saying you may have had to pay less premiums had there not been this diversion from the pharmacy benefit managers. Your Honor, part of what's happened here is that the briefing has focused the issues a bit because MetLife has put before the court a plan document that has clarified what this money was for. You know, in pleading this case, we didn't have this, but now MetLife has put a plan document in front of the court that says this money is obligated to pay plan expenses. In other words, to pay claims or, you know, the various costs associated with the health care plan. That's allowed us to focus in on the allegation that we make in, I think, paragraph 34, that by removing this money, by not defraying the required contributions to fund the plan, MetLife necessarily increased those contributions. Okay. So you're saying that makes it different than Thole and Prohman because you have an admission here which removes the speculative nature of the suit in Thole and Prohman? I think that that's part of it. But I think that the bigger difference is that in Thole and Prohman, the plaintiffs did not even allege that they had suffered this sort of out-of-pocket loss. In both of those cases, the plaintiffs depended solely on the idea that the mere diminution of plan assets in which they had no interest was an Article III injury. And in both of those cases, win or lose, nothing was going to change for them. They were not going to get a cent. Now, here, we have not relied on that theory of standing at any point. This is a case about out-of-pocket loss. And ERISA here gives the plaintiffs a right to make whole relief, as the Supreme Court called it in the Signa v. Amara case, whereby they can recover their out-of-pocket loss caused by a breach of fiduciary duty. Can I just get some clarity about what you mean by MetLife taking these rebates and using them for their own benefits? Because I'm looking at paragraphs 32 and 33 of the complaint, and those appear to show those rebates going back into the Plans Trust. And is that correct? Your Honor, they were paid in the first instance into the Plans Trust and then removed by MetLife. At least that's what the plan's Form 5500 disclosure filing indicates. Where did they move to? What did they move for? Well, the plaintiffs allege that MetLife removed this money for its own corporate use and purposes, whatever MetLife wanted to spend it on, perhaps a speedboat for MetLife's CEO. The plaintiffs don't know. But what plaintiffs allege is that, well, and the plan confirms, is that this was money earmarked to pay health benefits. This was not money that MetLife could simply take and use as it pleased. And because of that, there is an individual injury as opposed to a plan-level injury. Yes, well, so that's step one. Step one is the removal of this money. And that's, you know, if that's where this ended, well, that would be full, that would be parolement. That's not where it ends, though, because this money that was taken out was earmarked to defray the contributions required of both MetLife and the employees, like plaintiffs, to fund the plan. And so by taking that money, that necessarily increased the amount of the contributions that these two parties that were otherwise responsible for funding the plan had to put into it. Under the plan, could MetLife have decided to use this money to decrease their contribution and leave your clients where they were, so to speak? Well, MetLife could have done otherwise. But again, what we're talking about is... No, is that an important question? Could they have done that? Yes, Your Honor. MetLife could have done that. But it's a question of what MetLife did do, right? So again, the violation of ERISA here is not that MetLife increased the plaintiff's premiums. The violation is not that MetLife made this discretionary choice that it could make. The violation here is that MetLife took this money, which under no circumstances could it have taken for itself in the manner that it did. And so the injury here is the consequence flowing from that. Could MetLife have mitigated that consequence? Could MetLife have done something differently, potentially? But typically, the excuse, well, I could have not violated the law and still injured you, is not an excuse for having flagrantly violated the law. And again, what we're talking about here are consequences falling from a legal violation. Focus me in on what are the consequences. You're saying that... Let me ask this. Historically, has the amount of premiums that your clients have paid, has it gone up? I believe it's varied, but I don't have specific numbers. Sometimes it goes up, sometimes it goes down. I mean, I assume tracking the way that premiums have gone for the last 20 years, I'm sure that they've appreciated over time. But I don't have the specifics in front of me. What is the best authority you have for the individual right that plaintiffs have to the amounts in the fund? Well, again, Your Honor, the plaintiffs here aren't claiming that they have some individual right to the amounts in the plan. They're claiming that they have an individual right not to have overpaid money that they already possessed into the plan. So where's the source of their individual right? How do you know under the plan when something is an overpayment and something is not? Whether it's an overpayment or not is, well, looking at the plan. I think that the important provision of the plan document is the one that we've been discussing that obligates MetLife to use these drug defates. Now answer the question. It's really good for us to know what you think. I think we're all elated to know what you think. Now answer the question that you've been asked. I'm sorry, Your Honor. The reason why I'm asking this question is because Edmondson says you have to show that the plaintiffs have an individual right to these monies that you're claiming. So where in the plan is the individual right to these monies? Your Honor, there's no individual right to those monies in the plan. But that's also not what plaintiffs are claiming here. The authority that we're relying on is Cigna v. Amara and the cases that flow from that. And those are cases that hold that where a fiduciary has violated their fiduciary duties in a way that causes the plaintiff to incur an out-of-pocket loss, the plaintiff has a right under ERISA to make whole relief, to go to the fiduciary, not to the plan. To be clear, we're not saying that this money belonging to the plan belongs to us. We're saying that the fiduciary here has violated ERISA in a way that has caused us a loss, and we are entitled to make whole relief from MetLife itself. Your complaint doesn't say that. It says it may have. Well, Your Honor, it says that in two spots, Your Honor. Those are critical spots. Oh, they are. It's the paragraph you refer us to. There are also other spots where we are. I'll admit that those are not in our plea. Tell us where you affirmatively plead a specific loss in the complaint. In paragraph 34, we say that the removal of these plan assets available for benefits necessarily resulted in the payment of higher premiums. So that is essentially the injury that's before the Court today. And as I said, this case has become more focused since it began based on the production of this plan document that has, I think, demonstrated where this money would have gone had MetLife not taken it for itself. Would jurisdictional discovery help here? We would demand it for that purpose. And if it would help, what would you hope to get from jurisdictional discovery that would allow you to amend the complaint that you don't have now? Your Honor, jurisdictional discovery would help. And that is essentially what we've sought all along. We asked for MetLife's actuarial documents. MetLife's documents demonstrating, you know, where this money went and how it would have been used if it hadn't been taken by MetLife. Now, that would, I think, prove to you a certainty or disprove that the plaintiff's... I'm not sure it would. I mean, what we're looking for is a document that says that MetLife was obligated to give this money to these individuals. And so I don't see how their actuarial documents would do that. It seems like you'd need a contractual document between MetLife and the plaintiffs. Well, Your Honor, the argument, again, is not that MetLife was obligated to give this money to these individuals. MetLife was not obligated. In fact, MetLife was not supposed to give this money to these individuals. It was supposed to use this money to defray the overall cost of providing health benefits. So I think that the actuarial documents that we're looking at are, what were the actuarial processes in place at the time that MetLife took this money? So the challenge with that, I mean, we are bound by Edmondson, which very specifically says that these plaintiffs have to have an individual right to this profit. That was the word used in Edmondson. So these amounts, and again, I don't mean MetLife is going to write a check to them, but I mean, via the plan, we need an individual right to these amounts of money that you say have been taken out of, indirectly, out of your clients' pockets. And so is there any discovery that could get us that? Your Honor, again, the issue is not that the plaintiffs have not received money from the plan that they were supposed to receive. The issue is that they have paid money out of their own pocket, and the authority there is, again, signa via mara and the cases following from that, which say, if a fiduciary violates their fiduciary duty in a way that causes an out-of-pocket loss, that the plaintiff can go to the fiduciary and seek, make whole relief in the form of disgorgement or surcharge. What we're asking for is not proof that this money should have flowed from the plan to our plaintiffs. We're asking for proof that if MetLife hadn't taken this money, we wouldn't have paid X amount in premiums. That, in fact, we would have two more dollars in our pocket today than we would otherwise. And the point of this case is, in significant part, to go to MetLife and say, you took this money, and you owe us this money that we paid you back. Let me read from Edmondson. This is at page 417 of our opinion. And here we're explaining our prior holding in Horvath, quoting, Horvath holds that a plaintiff must show she has an individual right to the defendant's profit, and that when a plan has the right to the profit, the individual plaintiff has not suffered a constitutional injury. Not dealing with a constitutional injury, but that was because of the way they're finding it standing. Well, why wouldn't you have the same problem here? Wouldn't, if an excess amount of money was withheld from the money coming from the pharmacy benefit managers, wouldn't it be the plan that would have suffered the loss? And you're kind of arguing almost a derivative kind of holding, aren't you, from the injury that the plan would have sustained from the absence of this benefit money. Your clients are saying paid more than they should have paid for their health benefits. But that injury is derivative to the injury of the plan, which might be okay for your purposes under Article 3. But help me understand how that language from Edmondson does not prevent a problem for you. Well, Your Honor, I think that the individual right to the defendant's profit here comes from the fact that this is money the plaintiffs paid or overpaid to MetLife that they should not have paid. And the authority is that they are entitled to make whole relief to recover what they paid as a result of this ERISA violation, as a result of this fiduciary breach. But that assumes that MetLife would have reduced the premiums as opposed to just use that money to increase their contribution, right? Well, it assumes that MetLife would have left in place the actual aerial process that it had in place at the time. Yeah, we can figure every year. Well, they didn't. So I don't know that there's any reason to think that MetLife would have changed that process based on withholding or not withholding these rebate amounts as you'll see in the Form 5500 document excerpted in our complaint at paragraph 32. The amounts of the rebates change from year to year, but MetLife, we allege, did not change the formula to try to equalize the payment or anything like that. The plaintiffs allege that there was an actuarial process in place here that was essentially plug and play. And if that's the case, if MetLife just sustained this for years and there's no indication that MetLife was going to change it, well, I think that that gets you directly to the sort of causation that we're talking about here today. I think I asked this before, and I apologize for asking it again, but your answer brings it to mind again. Did the premiums that your clients paid change year over year? I think you said they tended to go up, and I'm not sure that they tended to go up every year. Yes, Your Honor, I said that I understand that the premiums did change. I don't have the specific amounts before me, but— I don't know if the change in relation to or consistent with the pro rata change in the amount that the benefit managers could have put back into the plan. Does that make any sense? Well, I think I understand what you're saying, whether that could be some sort of tying the actuarial process and taking these amounts out and fluctuations in our plaintiffs' premiums. I think that that's exactly the sort of thing that we would have to explore in jurisdictional discovery. This is the sort of information that we would be looking for based on the injury we've pled. I see that my time is up. See you at rebuttal. Ms. Santos? Good afternoon, Your Honors. May it please the Court. My name is Jamie Santos, and I represent MetLife, the defendant appellee. We think there are two reasons why the plaintiffs didn't establish Article III standing, the injury in fact requirement. First, the plaintiffs are purporting to claim economic injury in the form of out-of-pocket losses. But perhaps the defining characteristic of employer-sponsored, self-funded benefit help plans like this are that they are designed to shield participants from the risk of loss. They actually place the risk of loss or the risk of underpayments on the plan sponsor, who's required to pay all health care claims that are submitted at the end of the year. And even if there's some type of fiduciary breach or an economic situation making health care costs really expensive, they have to pay those costs out of their own pocket if need be. And so if a plaintiff that's in one of these plans alleges some type of fiduciary malfeasance that increased costs or depleted trust assets, but at the end of the day, the plan sponsor paid all the benefits that were promised, then that necessarily means that the sponsor filled any supposed shortfall through their own general assets. And so I think in... Well, and that's what the court in full was saying. But it seems to me that Mr. Gokey's alleging something slightly different, that there's a fund of money that could have gone back into this pot, and that by not putting the health care premiums increased. That, I think, is different from the kind of defined benefit plan that was at work for an issue in full. Correct me if I'm wrong. I don't think that's quite right, Your Honor, because in both the defined benefit context and the self-funded health plan context, there are still the benefits, whether it's the premiums and the health care that's being afforded, that's defined by contract, by the plan, essentially by contract. There may be a trust or more than one trust of assets that help support those benefit payments. But ultimately, the trust, there's no individual right to any part of the trust. The plan sponsor may pay some of those benefits out of the trust and some of the benefits out of its own general assets. That's what Section 5.7 of the plan provides here. And so in either of those situations, if there's any surplus, any excess, any amounts that Does the trust fund, is funding the plan, does that have a right to the money coming back into the plan? So the participants don't have any right to money that comes into the plan. And I think you can see that in Section 5.9 of the plan, which is on page 15 of the supplemental appendix. It specifically says that any receivables that come into the plan can be used to add to reserves by the plan administrator. They can be used to pay for benefits that will affect everyone or any particular part of the plan. But it specifically says that no participant has a right to receivables that come into the plan. Does the plan itself, any receivables coming into the plan, is the use of those receivables restricted somehow to adhere to the benefit of the plan? Forget the members of the plan or the beneficiaries of the plan. The plan itself and receivables coming in tied contractually or otherwise to that fund which we're calling the plan. Right. The plan document does say in Section 5.9 that money that's received into the plan is used to fund various aspects of the plan. And I think if you look at the summary plan description that Mr. Goki pointed to, it says MetLife will receive prescription drug rebates and use those to pay plan expenses. What happens if money comes in and they don't use those to pay? Which is, I think, the nature of the allegation here. It's speculative the way it's pled because he doesn't know. What if money comes in and does not go to the benefit of the plan? Then I think as to the standing question here, the question would be whether, and if I get a chance, I want to push back on why I don't think that's quite right. But even taking that as true, the plaintiffs would have to show that that adversely impacted them. And the way these plans are designed is so that if money, if there's a shortfall in the plan, if health care costs skyrocket, if there's some fiduciary malfeasance that makes health care way more expensive, the risk of loss is on the plan sponsor rather than on the participant. And if all of the claims are paid at the end of the year, then that means that the plan sponsor fulfilled its obligations to fund any shortfall. And so I think in a context like this, a plan participant would have to point to something well pleaded and that plausibly suggests that despite the fact that these plans are designed, this is a virtue of these plans, not advice, they're designed to insulate participants from economic loss, that there's something unusual that happened that caused them to incur economic loss. And I think that Mr. Gokee has kind of offered three different theories of ways that participants could have been adversely impacted on their pocketbook. Can we just pause for a second? Yes. So who sets the amount that participants need to pay each year into the plan? The plan sponsor sets that amount. And what all the plan says about premium contributions by the employer or the employee, and this is in section 4.1, I think, on page 12 of the supplemental appendix. It just says that employee premiums are the amounts that are provided in a component plan or any amount that's communicated to participants. And the employer contribution is everything else. So this is something that's set by the plan sponsor and is not governed by ERISA. So what if the plan sponsor just decided to say, you know, instead of 30 percent of annual contribution to the plan, we're going to now ask for individuals, plan members, to pay 50 percent? Would that be permissible under the terms of the plan? A plan sponsor, so if the terms of the plan set a specific amount, the plan sponsor would have to amend the plan and go through a process for doing so to change the amount. But if the plan is here, it just says that the plan sponsor sets amounts and then communicates it to participants, a plan sponsor can always change health care premiums. So it can cancel the plan entirely. It can change premiums so that it's entirely employee funded. Or if things are really going to be gangbusters with the employer, they can say, you know what? The market says that our competitors are paying all employee premiums, so we're going to do the same thing here. The employer can do that any year, you know, in any given year, and it changes each year. And in this scenario, is MetLife both the employer and the plan sponsor? Yes, so the employer, so employer-sponsored health plans, in those situations, typically the employer would be the one who sponsors the plan. So the employer gets to determine how much the individuals contribute to the plan. And then, as you said, it just makes up the difference. So if it were to unilaterally change the amount, increase the amount that individuals pay, then necessarily the employer-sponsor's contributions would be smaller. Is that correct? That's correct. And that's something that the sponsor can do. Now what the sponsor can't do is just kind of change premiums, or change deductibles, or change benefits mid-year. So if you have a situation in which a plaintiff is alleging fiduciary malfeasance, that a fiduciary just, you know, embezzled a bunch of money out of the plan, and the employer says, oh my goodness, we don't have enough money to fund that shortfall, we're sorry participants, we're going to jack up your premiums, or we're not going to pay these contributions, that would be out-of-pocket loss. That would be something that a plaintiff could allege. But what that would be is a failure to receive the benefits that were promised, which under Tholl, and under Perelman, and under Horvath, and under Edmondson, would constitute injury in fact. That would be a situation in which the kind of structural safeguards of these types of plans that usually shield participants from loss, you know, those fell short, and then you'd have some type of injury. But if all of the benefits were provided at the end of the year, and then just the complaint is, well, maybe in a future year premiums were raised, I don't think that could be a ground for standing. But let me just point to the fact that even if you would disagree with me on that, I think the plaintiffs would have to point to some way in which premiums were tied to a, you know, that there was some, you know, actual formula that premiums were determined based on the size of the trust in any given time, or based on a kind of percentage of cost formula. And the plaintiffs haven't alleged anything like that here. They don't know what the formula is. I'm sorry. They don't know what the formula is. There's zero allegations in the complaint whatsoever that allege any type of formula as existing. There's nothing in the plan. I've never seen a plan that is where employee premiums are based on a percentage of cost measure, or a size of the trust measure. And recall that in many cases, including for MetLife, there may sometimes be trust that fund at various aspects of the plan. I think the MetLife plan has four different trusts that fund different components. But a lot of times, benefits are being funded out of the employer's general assets. So the notion that there's going to be some, you know, percentage cost that's based on the amount of money in the trust at any given point of time wouldn't make a lot of sense for a plan like this, which is why I think Mr. Gokie hasn't been able to point to any plan that works this way. And as to the kind of, I think... Let me answer. If I understand you correctly, let's assume there's this pot of money, right, from the rebates, and it comes back to the plan or the trust, it would not impact premiums ever? That's... What I'm saying is that there's no allegation that the size of the trust is in any way tied to the premiums. Premiums can be based on a lot of different things, and I think that is what is discussed in cases like the Windsor case that we cite and the other kind of health plan cases that we cite. They could be based on market conditions. And so for the plaintiff to be able to say, we were harmed by our premiums being increased, they'd have to allege, plausibly allege, some facts suggesting that there was some tie between the level of premiums and, you know, something that they're pointing to that caused a depletion of plan assets. What about the argument is that our premiums would have been lower if this money had been put into the trust? Well, your Honor, I think that that is similar to the type of argument that was made in cases like Finkelman, where the plaintiff said, well, you know, if there had been more tickets on the secondary market, supply demand, it would be cheaper. And the court said that's speculation. Or in Thorn, where the plaintiff said, compliance costs are, you know, figured into the cost of the product, so if there isn't compliance, my tires would have been cheaper. I think what this court has required over and over again is some type of plausible allegation that is fact-based that isn't just speculation. And the two paragraphs that Mr. Gokey has pointed to, I think he cited paragraph 34, but I think it's actually paragraph 30, where he says, look, we allege it necessarily resulted in an increase in premiums. There's no facts in that paragraph. There's a whole bunch of citations about what plan assets are and then a portion of a sentence that said, and so this necessarily resulted in higher premiums. And the way you can tell that it's not a fact is that it's followed by a citation to a different And then the other allegation that I think he's pointed to, a 70-30 split, which again, is not in the plan. I've never seen a plan that employee premiums are calculated that way. That's in paragraph 21, and that alleges that over the past five years, premiums were around 30% on average. That's not a formula. That's just long division. That's performed after the fact. So I think there would have to be some factual basis beyond, well, this is something that's let us, let the court exercise jurisdiction over this case for months and months and months, even though we haven't even plausibly alleged any facts supporting that we were injured in any way. So I want to talk a little bit about Dole. And I know that it seems to me that you're saying the district court got this right in trying to decide whether this is more like a defined benefit plan or a defined contribution pension plan. But it seems to me that this is neither. It is in a situation where, like a defined benefit pension plan, where there's a contract, you get $1,000 a month for the rest of your life. That's not exactly what's happening here. And so why do we need to fit this into that binary that Dole established for the purpose of pension plans? I don't think that you have to fit it into a binary. I don't think the court has to say, this is akin to a defined benefit plan. I think what the court needs to do is look at the context and the nature of the claims and the nature of the protections that are provided. And so I think the court can simply say, and would correctly say, one of the fundamental characteristics of these types of defined health benefit plans is that employees are generally shielded from the risk of loss. Any risk of loss is placed on the employer. And employees are shielded from it because they're promised particular benefits. And if they receive those benefits at the end of the day, then the employer has incurred any loss that happens. So if there's fiduciary malfeasance and the employer has the obligation ultimately to pay all the claims out by the end of the plan year, then if the employer does that, then the employer certainly will be harmed. If a fiduciary embezzles money and the employer says, all right, I have to dig into my pockets and fund these health claims, the employer's been harmed. The plan's been harmed. But the plaintiff hasn't been harmed unless they can point to something unusual that meant that the plan wasn't operating as possible or as it was intended to. So I don't think the court has to say there's two types and this fits in type A or B. I think the court can say that the characteristic that matters most about this plan is that employees are generally shielded from the risk of loss. And the plaintiffs haven't pointed to anything that could plausibly establish or plausibly suggest that they incurred injury. All they're saying is, we had higher premiums with no factual after factual basis to support it. If the court has no further questions, we ask the court to affirm. This is something you said you wanted to push back on. I can't remember what it was now. Oh, yes. If you remember what it was, go ahead and push. So it was about the notion that there's an allegation that MetLife used the rebates that it took out of the plan for whatever it wanted. So there is- I was about to say they took it and used it- Speedboat. To a speedboat. Speedboat, right, right. So two things I'll say about that. One is that I don't think that's an actual factual allegation as opposed to speculation. Paragraph 34 just says these were taken out of the plan and didn't benefit participants. And if you look at how the plan operates, so the SPD says MetLife, the sponsor, will receive rebates. MetLife will use rebates to pay plan expenses. The plan itself, section 5.7, says MetLife pays for health care coverage and pays for health benefits out of its general asset. So I think just saying in paragraph 34 it didn't benefit us is essentially an allegation that is nuh-uh, right? There's no factual allegation there that anything was taken out of the plan and used for anything else. Again, I don't think our argument hinges on this in any way because we are saying that even if you assume that's true, they haven't demonstrated any harm. But I think that what you see in the 5500 and what you see in the plan document is exactly what you'd expect to see if a plan sponsor generally receives those types of receivables and pays for claims out of its general assets. Thank you, Your Honors. Thank you. Thank you, May it please the Court. I'd like to start where we just left off in terms of what the record shows in terms of how these rebates were used. Now, if you look at pages 142 to 143 of the appendix, what you have is a Form 5500 filing that documents how funds came into and left the plan. Well, that document shows millions of dollars in drug rebates coming into the plan and then being paid to MetLife and then shows the plan paying health care claims itself out of a plan assets. It effectively illustrates precisely the point that we're talking about here. It sounds like it illustrates what Ms. Santos was calling fiduciary malfeasance at most, but not necessarily an injury to your client who had their claims paid at the end of the day. Well, I'd like to well, I'll start with that point. So I've heard a lot about the plaintiffs received the benefits that they were promised and that MetLife bore the risk. Well, MetLife did not bear 100% of the cost of providing these benefits. And regardless of whether the plaintiffs received the benefits they were promised under the plan, we allege they were forced to pay more for those benefits than they should have. And I know that MetLife has talked about, well, the plaintiffs agreed to pay those premiums for these benefits. Well, that's often the case that where a plaintiff has overpaid for something, they have agreed to pay that amount and essentially gotten the benefit of their bargain. So take, for example, this court's opinion in the in-ray antitrust brokerage cases that we cite. Well, in that case, this court held very straightforwardly that the payment of inflated insurance premiums is an Article III injury. And that was so in that case, despite the fact that presumably those plaintiffs, just like ours, agreed to pay those premium rates. And those plaintiffs, there's nothing in the opinion that suggests they received anything other than the insurance benefits that they were entitled to. But they had suffered an Article III injury because the defendant's unlawful actions had caused them to pay more than they should have, which is precisely what we allege here. And in terms of the facts that we allege here, I've heard that we don't allege anything. Well, primarily the argument that I'm hearing is that the court should ignore binary true false facts because the plaintiffs don't have details, which they obviously can't possess at this point. But that's not how this court has explained the standing analysis to work. Now, in Finkelman 2, this court explained that the liberal pleading standard for standing is reconcilable with this idea that you need to plead a plausible injury because what you do is you take out facts that are essentially unprovable predictions and then leave the factual allegations. I'm sorry, they're unprovable what? Unprovable predictions and leave in the factual allegations. Now, we've alleged that the overall premium amount here was set by an estimation of the overall cost of funding health benefits from year to year, that that amount was reduced by the plan assets available for benefits, which should have included the drug rebates that issue in this case. That MetLife instead took those drug rebates for itself, causing the overall amount required to fund health benefits to go up. And then that larger pool was then split 70-30 between MetLife and the employees. Now, these are factual allegations that are true or false. And again, these are the sorts of things that we can't point to a document at this point because we haven't had discovery. Thank you very much. Thank all counsel for the briefs and the arguments. We will take this case under advisement and circle back to you soon. Thank you, Your Honor.